## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

CLIFFORD GENE MYERS,      )
                                         )

          Plaintiff,        )
                                         )

vs.                                 )     **Case No. CIV-10-334-D**
                                       )

LEWIS HAWKINS, et al.,      )
                                       )

         Defendants.     )

## REPORT AND RECOMMENDATION

Plaintiff, Clifford Myers, appearing pro se, has brought this action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights while incarcerated in Canadian County, Oklahoma. The matter has been referred to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B).

### Plaintiff's Complaint

Plaintiff generally alleges that he "was a pretrial detainee at the Canadian County jail awaiting trial for Escape from a Penal Institution" and was "a documented epileptic, with grand maw style seizures as well as documented asthma, mental disorders and PTSD." [Doc. No. 1, p. 3].[1] He asserts a single ground of deliberate indifference to his serious medical needs. In support of this claim Plaintiff maintains that "[w]hen the Oklahoma Department of Corrections delivered the Plaintiff to the County Jail, they also brought his medications.

---

[1]Unless otherwise indicated, quotations in this report are reproduced verbatim.

Once his medications were out the Defendants[2] refused to get him any more, refused to have DOC bring him any, until he had a major seizure." *Id.* Plaintiff alleges that the Defendants took him to the hospital and then "forced [him] to purchase his own medications [in] violat[ion of] the Fourteenth Amendment as well as the Plaintiff's due process rights." *Id.* Plaintiff then sets out dates on which various events occurred and describes each event in detail, *id.* at 3 - 4, and, in addition to his generally described complaint regarding the denial of medications, alleges that he sought transfer back to the Oklahoma Department of Corrections ("DOC") "so that he could receive his needed medications." *Id.* at 4. Monetary damages are requested. *Id.* at 6.

**Pertinent Case Background**

**Defendant Hawkins**

After service was obtained "on Lewis Hawkins or Current Sheriff" [Doc. No. 17], Defendant Hawkins, in his official capacity only, notified the court that he was no longer Sheriff of Canadian County, Oklahoma, and requested the "substit[ution of] the Sheriff of Canadian County, Oklahoma in his official capacity for Defendant Hawkins in his official capacity[.]" [Doc. No. 25, p. 1]. Plaintiff was given the opportunity to object to the substitution request [Doc. No. 27]. No objection was filed, and substitution was ordered [Doc. No. 33].

---

[2]As is stated below in the explanation of the procedural background of Plaintiff's action, Plaintiff originally named six Defendants but elected to dismiss three of them because he had been unable to serve them.

**Defendants Nold, Johnston, and Holy**

In response to Plaintiff's action and this court's order [Doc. No. 11], a Special Report was filed by Randall Edwards, the Canadian County Sheriff, in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) [Doc. No. 34]. In addition, Defendants Sheriff of Canadian County in his official capacity, Youngblood,[3] and Penwright[4] moved in the alternative for dismissal or summary judgment [Doc. No. 35].

Prior to responding to Defendants' dispositive motion, Plaintiff filed a motion to amend his complaint, stating that he had been unable to serve three of the named Defendants and that "[t]he interests of justice would best be served by this Court deciding his claims with the Respondents that have been served." [Doc. No. 43, p. 1]. Because the amended complaint contained no substantive changes to Plaintiff's original complaint but, instead, simply eliminated named Defendants Nold, Johnston, and Holy as defendants, the undersigned denied the motion to file the amended complaint but construed it as one brought

---

[3]Plaintiff states that Defendant Youngblood is employed by the Canadian County Sheriff's office as a detention officer and chief jailer [Doc. No. 1, p. 1]. Plaintiff maintains that Defendant Youngblood "has the final authority when it comes to the daily operation of the jail." *Id.*

[4]Defendant Penwright is described as a detention officer and employee of the Canadian County Sheriff's office whose "duties include feeding the inmates; and insuring that medications are passed out to the proper inmate; as well as insuring that the inmates are safe and properly locked in their cells." [Doc. No. 1, p. 2].

pursuant to Fed. R. Civ. P. 21 and granted Plaintiff's request to drop Defendants Nold, Johnston, and Holy [Doc. No. 45].[5]

**Dispositive Motion Issues**

Plaintiff then filed his response to Defendants' motion [Doc. No. 48]; Defendants replied and "concede[d] that Plaintiff's assertions . . . raise a question of fact as to whether Plaintiff exhausted the available administrative remedies prior to filing suit." [Doc. No. 53, p. 4]. In light of Defendants' waiver of this affirmative defense, their initial claim of failure to exhaust administrative remedies [Doc. No. 35, pp. 12-13] has not been considered in this report. For the reasons which follow, upon review of the remainder of Defendants' arguments and Plaintiff's response thereto, as well as upon consideration of the undisputed facts and the supporting evidence proffered by both sides, the undersigned finds that Defendants' alternative motion for summary judgment should be granted.

**Standard of Review**

**Customary Standard**

Summary judgment may be granted only where the pleadings and any discovery materials and affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In

---

[5]In his later response to Defendants' dispositive motion, Plaintiff stated that "Sgt. Nold, along with two other individuals were originally set down as co-defendants in this case, however, the U.S. Marshall was unable to locate these individuals and they were not served. The Plaintiff has asked that these individuals be removed from the case and this Court has granted that request. . . ." [Doc. No. 48, p. 9, n.2].

considering a motion for summary judgment, the court must view the facts and inferences drawn from the record in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382,* 462 F.3d 1253, 1258 (10th Cir. 2006) (quotation omitted). Nonetheless, the Supreme Court has determined that

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Additionally, when an affirmative defense is asserted in a motion for summary judgment, Defendants "must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir. 1997). "If the defendant[s] meet[] this initial burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact." *Id.* "If the plaintiff fails to make such a showing, the affirmative defense bars his claim, and the defendant[s] [are] then entitled to summary judgment as a matter of law." *Id.*

### Individual Capacity Claims – Specific Standard of Review

Defendants Youngblood and Penwright have asserted the defense of qualified immunity in response to Plaintiff's claims against them in their personal capacities. In its decision in *Thomson v. Salt Lake County,* 584 F.3d 1304, 1312 (10th Cir. 2009), the Tenth Circuit court set out the legal standard of review to be followed by federal courts in analyzing

a claim of qualified immunity at the summary judgment stage. Quoting *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009), the court explained that "[w]hen a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Thomson,* 584 F. 3d at 1312. The scope of Plaintiff's burden and the meshing of traditional summary judgment standards with a qualified immunity analysis were described as follows:

> In determining whether the plaintiff has met its burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to the plaintiff as the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *see Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir.2009) ("The plaintiff must demonstrate *on the facts alleged* both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity.") (emphasis added); *Riggins*, 572 F.3d 1107 (noting that generally "we accept the facts as the plaintiff alleges them"). However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]' " *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir.2008) (quoting *Scott*, 550 U.S. at 380, 127 S.Ct. 1769) (second and third alteration in original); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

*Id.*

## Statute of Limitations Defense

As Defendants correctly assert in their second proposition, the limitations period for a civil rights action is governed by the forum state's law pertaining to personal injury actions.

*Wilson v. Garcia*, 471 U.S. 261, 276 - 80 (1985). In Oklahoma, that limitations period is two years. *See Meade v. Grubbs,* 841 F.2d 1512, 1522 (10th Cir. 1988). Here, Plaintiff complains of alleged constitutional violations occurring between January 16, 2008 [Doc. No. 1, p. 3] and May 8, 2008. *Id.* at 4. Because Plaintiff filed this action on April 2, 2010, Defendants argue that "any of Plaintiff's claims allegedly occurring before April 2, 2008 are barred by the applicable statute of limitations." [Doc. No. 35, p. 14].

In response, Plaintiff advances two arguments as to when his cause of action accrued. First, he relies on Oklahoma's discovery rule which provides that "the limitations period does not begin to run until the date the plaintiff knew or should have known of the injury." *The Samuel Roberts Noble Found. v. Vick,* 840 P.2d 619, 624 (Okla. 1992). *See Erikson v. Farmers Group, Inc.,* 151 Fed. Appx. 672, 676 (10th Cir. 2005). Plaintiff asserts "that since he was not aware of the constitutional violation until January 2010, he was well within the two-year limitations period." [Doc. No. 48, pp. 6 - 7]. Nonetheless, not only does Plaintiff fail to provide any objective facts concerning his January, 2010 "discovery," but evidence of record – April, 2008 letters written by Plaintiff from the Canadian County Jail requesting a form civil rights complaint [Doc. No. 34, Special Report, Exhibit Nos. 26 and 27] – plainly discredits the conclusory assertion. Moreover, Plaintiff urges in his own briefing "that his cause of action started when he was first denied his medications[.]" [Doc. No. 48, p. 6]. According to Plaintiff's complaint, this occurred in early February, 2008, some twenty-six months before his complaint was filed [Doc. No. 1, p. 4]. Plaintiff knew or should have known that his cause of action arose when he did not receive the medications to which he

believed he was entitled; the discovery rule does not prevent the bar of Plaintiff's pre-April 2, 2008, claims.

Plaintiff's second argument for avoiding a partial bar of his claims by virtue of the statute of limitations is as follows:

> The Plaintiff argues that his cause of action started when he was first denied his medications and was not allowed to visit with medical/psychological professionals. This denial continued until the Plaintiff was sent back to prison in May of 2008. Plaintiff infers that the acts complained of, were an ongoing and continual violation of his constitutional rights, and therefore he was within the time allotted by law."

[Doc. No. 48, p. 6].

The continuing violation doctrine "is a creation of federal law that arose in Title VII cases [and] recognizes that certain violations are continuing in nature and provides that a claim asserting such a violation is timely if administrative charges are filed within the period applicable to the last act in the continuing series." *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1513 (10th Cir. 1997). "To establish a continuing violation, a plaintiff must show that the claimed discriminatory acts that occurred outside the limitations period were sufficiently related to at least one act occurring within the relevant filing period, thereby constituting a continuing pattern of discrimination." *Frazier v. Jordan,* No. 06-1333, 2007 WL 60883, at *4 (10th Cir. Jan. 10, 2007)(citation omitted)(unpublished op.). The Tenth Circuit Court of Appeals has not determined whether the continuing violations doctrine is applicable to a § 1983 claim. *Id*. *See also Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994) (declining to determine if the doctrine is applicable to § 1983 suits); *but see Parkhurst v. Lampert*, 264

Fed. Appx. 748, 749(10th Cir. 2008) ("Assuming the continuing violation doctrine applies to § 1983 claims, the doctrine is triggered by continual unlawful acts, not by continual ill effects from the original violation.") (internal citation and quotation omitted) (unpublished op.).  In order for the continuing violations doctrine to apply, there must be at least one wrongful act within the statutory filing period.  *See McCormick v. Farrar*, 147 Fed. Appx. 716, 720 (10th Cir. 2005); *see also Burkley v. Correctional Healthcare Management of Oklahoma, Inc.,* 141 Fed. Appx. 714, 716 (10th Cir. 2005) ("The continuing violation doctrine permits a court to look backwards to the entirety of a continuing wrong to assess its cumulative effect, so long as an injurious act falls within the statute of limitations period."). Thus, without determining whether the continuing violation doctrine applies to a § 1983 case, the undersigned has first evaluated Plaintiff's evidence to determine whether Plaintiff has established for purposes of summary judgment that a Defendant committed at least one wrongful act within the statute of limitations period, in this case from April 2, 2008, until June 4, 2008, the date on which Plaintiff was released from Canadian County's custody [Doc. No. 34, Special Report, p. 2, Exhibit 5].

**Deliberate Indifference**

The Eighth Amendment requires prison officials to provide humane conditions of confinement, including access to the basic necessities of medical care.  *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).[6]  The

_____

[6]*See Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1315 (10th Cir. 2002) (citation,
(continued...)

United States Supreme Court has made clear that "deliberate indifference to serious medical needs of prisoners constitut[ing] the 'unnecessary and wanton infliction of pain,'" may amount to a violation of the Eighth Amendment. *Id.* at 104 (citation omitted). This deliberate indifference standard has two components: (1) an objective component in which the plaintiff's pain or deprivation must be shown to be sufficiently serious, and (2) a subjective component in which it must be shown that the offending officials acted with a sufficiently culpable state of mind. See *Handy v. Price,* 996 F.2d 1064, 1067 (10th Cir. 1993); *Miller v. Glantz,* 948 F.2d 1562, 1569 (10th Cir. 1991). As to the objective component, the Tenth Circuit has stated that a condition is sufficiently serious where the condition is one diagnosed by a physician as mandating treatment or that is so obvious even a lay person would easily recognize the necessity for a doctor's attention. *See Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980). As to the subjective prong of this test, a plaintiff must establish that a defendant knew of a substantial risk of harm and failed to take reasonable measures to abate it. See *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999). Such deliberate indifference may be shown where prison officials "have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ramos,* 639 F.2d at 575.

---

[6](...continued)
quotation marks, ellipses, and brackets omitted) ("Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983.").

## Undisputed Facts

Plaintiff has affirmatively stated that he "accepts as facts"[7] [Doc. No. 48, p. 2] the

following undisputed facts detailed in Defendants' opening brief [Doc. No. 35, pp. 2 - 9]:

1.    Plaintiff was arrested and booked into the Canadian County Jail on January 16, 2008 on a Felony Warrant for escape from the Department of Corrections ("DOC") custody [Doc. No. 34, Special Report, p. 2,[8] Exhibits 1-2].

2.    At the time Plaintiff was booked into the Jail, Plaintiff had the following medications from the DOC in Union City: Qvar Inhaler 80 mcg; Albuterol 90 mcg; Amitriptyline (Elavil) 100 mg; Valproic Acid 250 mg; Phenytoin (Dilantin) 100 mg; and Chlorpromazine 200 mg. Plaintiff continued to receive these medications until the prescriptions ran out [Doc. No. 34, Special Report, p. 2, Exhibits 1 and 6].

3.    At the times relevant to Plaintiff's claims, all new prescriptions and prescription refills for Jail inmates were required to be approved by the Jail's then-current contract physician, Dr. Vladimir Holy [Doc. No. 34, Special Report, p. 3].

4.    On January 21, 2008, Plaintiff submitted a Request to See Jail Doctor requesting treatment for "Epileptic meds and sphic [sic] meds." In that Request, Plaintiff indicated that he had been prescribed Dilantin (Phenytoin) and Amitriptyline (Elavil). At the time of Plaintiff's Request, Plaintiff was then currently receiving those medications [Doc. No. 34, Special Report, p. 3, Exhibits 6 and 7].

5.    On or about January 25, 2008, Plaintiff's prescription for Amitriptyline (Elavil) ran out [Doc. No. 34, Special Report, p. 3, Exhibit 6].

---

[7]Because Defendants filed an alternative motion of summary judgment, Plaintiff was specifically directed to the procedures he was required to follow in opposing such motion [Doc. No. 37].

[8]The statements made in the Special Report are verified by Randall Edwards, Sheriff of Canadian County, Oklahoma [Doc. No 34, Special Report, p. 14].

6.      On January 25, 2008, Dr. Holy decided not to refill Plaintiff's prescription for Amitriptyline (Elavil) and made a note to monitor Plaintiff for changes [Doc. No. 34, Special Report, p. 3, Exhibit 7].

7.      On February 3, 2008, Plaintiff submitted another Request to See Jail Doctor requesting that his prescription for Elavil (Amitriptyline) be refilled and that he be started on Artane (Trihexyphenidyl) again. However, Artane was not one of the medications that Plaintiff had with him when he was booked into the Canadian County Jail [Doc. No. 34, Special Report, p. 3, Exhibits 1 and 8].

8.      On February 5, 2008, Dr. Holy decided not to refill Plaintiff's prescription for Elavil or start Plaintiff on Artane, noted that Plaintiff would need a psych referral if he wanted Elavil, and made a note to monitor Plaintiff's behavior [Doc. No. 34, Special Report, pp. 3-4, Exhibit 8].

9.      The Canadian County Jail never received any prescriptions or orders that Plaintiff be prescribed Elavil or any other medications from any psychiatrist or other mental health professional [Doc. No. 34, Special Report, p. 4].

10.     On February 8, 2008, Plaintiff submitted an Inmate Request to Staff Member to Defendant Penwright requesting to him to check why Plaintiff's prescription for Elavil had not been refilled and referencing Plaintiff's two (2) previous Requests to See Jail Doctor. On February 8, 2008, Defendant Penwright submitted a written response to Plaintiff's Request and advised Plaintiff that Dr. Holy had looked over his medical requests and did not feel that the prescription needed to be refilled at that time [Doc. No. 34, Special Report, p. 4, Exhibit 9].

11.     On February 8, 2008, Plaintiff submitted another Inmate Request to Staff Member to Defendant Penwright claiming that, in the mornings, Jail staff kept forgetting to bring Plaintiff his Qvar inhaler and requesting whether same could be kept in his cell with him like his Albuterol inhaler. On February 8, 2008, Defendant Penwright submitted a written response to Plaintiff's Request denying Plaintiff's request to keep his Qvar inhaler in his cell and advising Plaintiff that he would bring the issue to the morning shift's attention [Doc. No. 34, Special Report, pp. 4-5, Exhibit 10].

12.     At the time of Plaintiff's Request, Plaintiff had been receiving his Qvar inhaler every morning and same had only been missed on four (4) occasions prior to the Request – on the mornings of January 23, 24, 28, and 31, 2008 [Doc. No. 34, Special Report, p. 5, Exhibit 6].

13.     On the evening of February 17, 2008, Defendant Youngblood received a call from jail staff advising that Plaintiff was claiming that he had suffered a seizure and that he needed to go to the hospital. Defendant Youngblood returned to the jail and had jail staff take Plaintiff's blood pressure and pulse. Plaintiff's blood pressure was within normal range and his pulse was slightly elevated [Doc. No. 34, Special Report, p. 5, Exhibit 11].

14.     Plaintiff told Defendant Youngblood that he had the "weeble woobles" and the felt like he was on a roller-coaster. Defendant Youngblood made the decision to transport Plaintiff to the Parkview Hospital emergency room ("E.R.") for examination and treatment [Doc. No. 34, Special Report, p. 5, Exhibit 11].

        18.[9]     The only medication which Plaintiff had run out of and was not receiving as of February 17, 2008 was Amitriptyline (Elavil) – one of the very psych meds which Plaintiff himself had blamed for his attack that evening. At that time, Plaintiff was then still currently receiving the medication to control his seizures – Phenytoin (Dilantin) [Doc. No. 34, Special Report, p. 6, Exhibit 6].

---

[9]Plaintiff failed to address Defendants' Undisputed Fact No. 15 and has accepted in part and denied in part Undisputed Fact Nos. 16 and 17. Accordingly, these facts are not included but are noted here so as to maintain the integrity of the numbers assigned by Defendants to their undisputed facts. Those facts that Plaintiff failed to address or disputed are discussed in following sections of this report to the extent that they remain pertinent following application of the continuing violations doctrine.

20.[10]  On or about February 26, 2008, Plaintiff's prescriptions for Qvar Inhaler, Valproic Acid, and Phenytoin (Dilantin) ran out. Plaintiff's prescription for Chlorpromazineran out on or about March 4, 2008 [Doc. No. 34, Special Report, p. 7, Exhibit 6].

21.  On March 4, 2008, Plaintiff submitted an Inmate Request to Staff Member to Defendant Youngblood asking why his medications kept running out and why wasn't being given Dilantin anymore. On March 6, 2008, Sgt. Nold submitted a written response to Plaintiff's Request and advised Plaintiff that his request needed to be addressed to the Jail Doctor and to put it on a medical request form [Doc. No. 34, Special Report, p. 7, Exhibit 15].

22.  On March 4, 2008, Plaintiff submitted an Inmate Request to Staff Member to Sheriff Hawkins asking to be sent back to D.O.C so that he could get medical attention. On March 6, 2008, Sgt. Nold submitted a written response to Plaintiff's Request and advised Plaintiff that he needed to address that issue with his attorney [Doc. No. 34, Special Report, p. 7, Exhibit 16].

23.  On or about March 4, 2008, Plaintiff also submitted a Request to See Jail Doctor requesting refills of his prescriptions for Dilantin, Amitriptyline, Valproic Acid, Thorazine, and Artane. (Exhibit 17, Request to See Jail Doctor dated March 4, 2008). However, Thorazine and Artane were not among the medications that Plaintiff had with him when he was booked into the Canadian County Jail [Doc. No. 34, Special Report, p. 7, Exhibits 1 and 17].

25.[11]  On March 18, 2008, Plaintiff submitted an Inmate Request to Staff Member directed to the "Medical Dr. of Jail" inquiring as to why his medications had been stopped. On March 18, 2008, Sgt. Johnston submitted a written response to Plaintiff's Request and advised Plaintiff that his request needed to be put on a Dr.'s Request form and provided Plaintiff with the form [Doc. No. 34, Special Report, p. 8, Exhibit 18].

---

[10]Because Plaintiff made no reference to Defendants' Undisputed Fact No. 19, it is treated in the manner discussed in n. 9, *supra.*

[11]Because Plaintiff disputed in part Defendants' Undisputed Fact No. 24, it is treated in the manner discussed in n. 9, *supra.*

26.     On or about April 4, 2008, Plaintiff submitted a Request to See Jail Doctor requesting refills of his prescriptions for Dilantin, Elavil, Thorazine, Artane, Celexa, and Qvar Inhaler. However, Thorazine, Artane, and Celexa were not among the medications that Plaintiff had with him when he was booked into the Canadian County Jail [Doc. No. 34, Special Report, p. 8, Exhibits 1 and 19].

27.     Dr. Holy decided not to refill those prescriptions at that time and made a note to obtain records of Plaintiff's previously prescribed medications and doses [Doc. No. 34, Special Report, pp. 8-9, Exhibit 19].

28.     On April 6, 2008, Plaintiff's Plaintiff submitted an Inmate Request to Staff Member directed to the "Staff on duty" and inquiring as to how much he owed for medical costs at that time. The staff's response was that, at that time, Plaintiff's medical costs had been paid and Plaintiff's trust account balance was $49.56 [Doc. No. 34, Special Report, p. 9, Exhibit 20].

31.[12]   On or about May 14, 2008, Plaintiff submitted a Request to See Jail Doctor requesting a refill of his prescription for Dilantin. At that time, Dr. Holy refilled Plaintiff's prescription for Dilantin (Phenytoin) 100 mg. Once the prescription was filled, Plaintiff began receiving this medication on May 17, 2008 and continued to receive same until he was released from the custody of the Canadian County Jail on June 4, 2008 [Doc. No. 34, Special Report, pp. 10-11, Exhibits 6 and 23].

32.     On May 29, 2008, Plaintiff pled guilty to the felony charge of escape from DOC custody in Canadian County District Court Case No. CF-2008-22 and was sentenced to a term of six years incarceration in the DOC. (Exhibit 3, Plea of Guilty; Exhibit 4, Amended Judgment and Sentence). On June 4, 2008, Plaintiff was transferred from the Canadian County Jail to the custody of the DOC [Doc. No. 34, Special Report, p. 2, Exhibits 3-5].

---

[12]*See* n. 9 as to Defendants' Undisputed Fact Nos. 29 and 30.

**Analysis**

Plaintiff's summary judgment evidence fails to establish any constitutional violation within the two-year period preceding the filing of Plaintiff's complaint on April 2, 2010. While Plaintiff generally complains that he was denied "his psychotropic medications for a period of approximately 5 months[,]" [Doc. No. 48, p. 1], there is no post-April 2, 2008, evidence that any jail officer, including Defendants Youngblood and Penwright, was empowered to obtain that medication for him or that any jail officer hampered his access[13] to the only individual who could provide it to him – Dr. Holy.[14] Likewise, Plaintiff has admitted that "[t]he Canadian County Jail never received any prescriptions or orders that Plaintiff be prescribed Elavil or any other medications from any psychiatrist or other mental health professional." *See* Defendants' Undisputed Fact No. 9 [Doc. No. 35, p. 3] and Plaintiff's admission of such Fact [Doc. No. 48, p. 2].

---

[13]Plaintiff argues that "[t]hrough-out his confinement at the Canadian County Jail, the Plaintiff attempted to pay a visit to the jail's doctor. The Defendant Hawkins' staff always thwarted his attempts." [Doc. No. 48, p. 8]. The evidence of record, however, establishes that Dr. Holy received and responded to Plaintiff's April 4, 2008, Request to See Jail Doctor [Doc. No. 34, Special Report, Exhibit 19] as well as to his Request to See Jail Doctor dated May 14, 2008. *Id.* at Exhibit 23. Plaintiff has not pointed to any Request to See Jail Doctor to which he did not receive a response. If Plaintiff's complaint is that Dr. Holy should have physically seen him, he has failed to point to any evidence that these Defendants or any jailor did anything to prevent Dr. Holy from so doing had the doctor believed that was necessary.

[14] "At all times relevant to Plaintiff's claims, all new prescriptions and prescription refills for Jail inmates were required to be approved by the Jail's then-current contract physician, Dr. Vladimir Holy." [Doc. No. 35, p. 2, Defendants' Undisputed Fact No. 3]. Plaintiff had admitted this fact [Doc. No. 48, p. 2].

As to Plaintiff's specific claims, on April 4, 2008, Plaintiff alleges that he submitted a form "'Request to See Jail Doctor' asking why he had not yet received any of his needed medication" and complains about the response he received:

> The Doctor stated that the Plaintiff needed to supply what medications he was taken as well as the dosage. However Defendant Nold[15] supplied his own answer to a request that was not addressed to him, that if the Plaintiff did not know what medications and their dosages they would have to get Plaintiff's Medical records. However, the Plaintiff did list his medications and their dosages on the Request.

[Doc. No. 1, p. 4].

With respect to this particular claim, Plaintiff has admitted as undisputed fact that "[a]t all times relevant to Plaintiff's claims, all new medications and prescription refills for Jail inmates were required to be approved by the Jail's then-current contract physician, Dr. Vladimir Holy." [Doc. No. 35, p. 2, Undisputed Fact No. 3; Doc. No. 48, p. 2]. Moreover, Plaintiff has acknowledged that his request for medications was received by Dr. Holy and that the doctor "decided not to refill those prescriptions at that time and made a note to obtain records of Plaintiff's previously prescribed medications and doses." [Doc. No. 35, p. 7, Undisputed Fact Nos. 26 and 27; Doc. No. 48, p. 2]. Thus, the addition by former Defendant Nold, who acknowledged Plaintiff's Request as the "Receiving Jailor," [Doc. No. 34, Special Report, Exhibit 19], of language which merely parroted Dr. Holy's response was of no

---

[15]In light of Plaintiff's official capacity claim against the Canadian County Sheriff, this claim against former Defendant Nold is discussed for purposes of determining whether Plaintiff has established a constitutional violation against any Canadian County jail officer during the relevant post-April 2, 2008, time period.

constitutional consequence. There is no evidence that former Defendant Nold did anything

to prevent Plaintiff from receiving the medications or prescriptions he sought from Dr. Holy;

rather, the evidence suggests that he effectuated delivery of Plaintiff's Request. "Referral

of medically-based grievances to medical personnel demonstrates action, not indifference,

on the part of a corrections officer." *Rose v. Beckham,* 82 Fed. Appx. 662, 665 (10th Cir.

2003).

Plaintiff's next specific complaint of action or inaction falling within the two-year

period prior to the date-of-filing is that on

> April 6, 2008 The Plaintiff in an attempt to get his medication, sent in yet
> another request and asked what it would take for him to purchase his seizure
> medication. The response was that the medications were purchased and
> $50.00 was removed from Plaintiff's trust fund account. He was still without
> his mental health medications. Exactly one month later, Plaintiff submitted yet
> another Request, this one to Defendant Johnston, though it was answered by
> Defendant Youngblood, and asked why He was not receiving his Mental
> Health when a Certified Clinologist from Red Rock Mental Health told the
> Defendant's that the medication was needed. The response was only the jail
> doctor can authorize medication. Interestingly, the Plaintiff came to the jail
> with those exact medications.

[Doc. No. 1, p. 4].

As to Plaintiff's assertion that he attempted to purchase seizure medication, the April

6, 2008, Request to Staff Member referenced by Plaintiff does not support the factual basis

of his allegation. Such request makes no reference to seizure medication but states only that

"I would like to know just how much I owe for medical cost at this time[.]" [Doc. No. 34,

Special Report, Exhibit 20]. With respect to his claim that a practitioner from the "Red Rock

Mental Health"[16] had told Defendants that he needed medication [Doc. No. 1, p. 4], Plaintiff has admitted that "[t]he Canadian County Jail never received any prescriptions or orders that Plaintiff be prescribed Elavil or any other medications from any psychiatrist or other mental health professional." *See* Defendants' Undisputed Fact No. 9 [Doc. No. 35, p. 3] and Plaintiff's admission of such Fact [Doc. No. 48, p. 2].

Plaintiff's third and final specific claim is that "[o]n May 8, 2008 the Plaintiff again submitted a Request to Staff to Defendant Johnston and asked if he could be transferred back to Department of Corrections so that he could receive his needed medications. The Defendant response: Get a Lawyer." [Doc. No. 1, p. 4]. To the extent that Plaintiff is asserting a constitutional violation in this regard, he has wholly failed to direct the court to any legal justification for such a claim in his briefing or to address it or the Defendants' response to it in any manner. Thus, Plaintiff is deemed to have abandoned any claim in this regard that he might have initially been attempting to assert.

The undisputed facts show that during the relevant time period, Plaintiff and his health situation were consistently monitored at the Canadian County Jail and that he has been provided with ongoing care, albeit not the care that he desired. *See* Doc. No. 35, pp. 7 - 9,

---

[16]To the extent that Plaintiff generally complains that he was denied access to a mental health professional, Plaintiff's April 6, 2008, Request to Staff Member along with his explication of that Request in his complaint establishes that he had contact with an individual he identifies as "Aimie Lewes Mental Health[,]" [Doc. No. 34, Special Report, Exhibit 22], who he describes as "a Certified Clinologist from Red Rock Mental Health[.]" [Doc. No. 1, p. 4].

Undisputed Fact Nos. 26 - 31.[17]  Following Plaintiff's arrival at the Jail and as he ran out of the medications that he had received at his DOC facility, former Defendant Dr. Holy departed from the medication regimen followed by the physician at Plaintiff's former prison, a decision with which Plaintiff disagrees.  There is no evidence that *any* action or inaction on the part of *any* former or current Defendant had *any* impact on Dr. Holy's professional decision making. At best, Plaintiff has established a disagreement with former Defendant Dr. Holy over his course of treatment and medications.  Such disagreement is not tantamount to deliberate indifference to Plaintiff's serious medical needs.[18]  See *Ramos*, 639 F.2d at 575.  *See also Perkins v. Kan.Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir. 1999).

---

[17]Plaintiff disputes Defendants' Undisputed Fact No. 29 which states that Dr. Holy placed Plaintiff on medical observation from April 25, 2008, until May 1, 2008, and that "there were no occurrences or other signs indicating that Plaintiff was experiencing any adverse health conditions or symptoms." [Doc. No. 48, p. 2 and Doc. No. 35, p. 8].  Plaintiff maintains that "[a]s for # 29, the Plaintiff states as undisputed fact that none of the defendants were medically trained and therefore could not with any certainty give a medical opinion about Plaintiff's state of being." [Doc. No. 48, p. 3].  Nonetheless, Plaintiff does not deny that the observation described by Defendants took place on Dr. Holy's order.  *See* Doc. No. 34, Special Report, Exhibit 21.

[18]Plaintiff seems to suggest that he was entitled to certain medications because they had already been prescribed for him by a physician at his former prison. A difference of opinion among professionals about treatment, however, does not give rise to a claim under the Eighth Amendment. *See Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1142 (10th Cir. 2005) ("The fact that another doctor had recommended [another course of action] merely established a medical difference of opinion, which is not actionable under the Eighth Amendment.").

## Defendants Youngblood and Penwright

In the absence of a violative act by Defendants Youngblood and Penwright within the two years before this suit was instituted by Plaintiff, the continuing violation doctrine does not apply. Thus, any pre-April 2, 2008, claims asserted by Plaintiff against Defendants Youngblood and Penwright are barred by the statute of limitations. And, because Plaintiff has not established that Defendants Youngblood and Penwright violated Plaintiff's clearly established constitutional rights within the two-year statutory period, Defendants Youngblood and Penwright are entitled to qualified immunity on Plaintiff's claim against them in their individual capacities.

## Defendant Sheriff of Canadian County

Plaintiff has sued the Sheriff of Canadian County, Oklahoma in his official capacity.[19] Any claim against the Canadian County sheriff in his official capacity is tantamount to an action against Payne County itself. *See Lopez v. LeMaster*, 172 F.3d 756, 762 (10th Cir. 1999) ("Appellant's suit against Sheriff LeMaster in his official capacity as sheriff is the equivalent of a suit against Jackson County."). Moreover, "[a] county or sheriff in his

---

[19]In his motion to substitute the Sheriff of Canadian County in his official capacity [Doc. No. 25], Defendant Hawkins observed by footnote that "[t]o the extent that Plaintiff may assert claims against Defendant Hawkins in his individual capacity, it appears that Plaintiff has not obtained proper service on Defendant Hawkins as the Complaint and Summons were purportedly served on Defendant Hawkins at the Canadian County Sheriff's Office at a time when Defendant Hawkins no longer occupied that office." *Id.* at n.1. After having been placed on notice of Defendant Hawkins' position, Plaintiff filed no response to the motion, made no effort to serve Defendant Hawkins in his inividual capacity, and made no claim in response to Defendants' dispositive motion that he was pursuing other than an official capacity claim.

official capacity cannot be held liable for constitutional violations when there was no underlying constitutional violation by any of its officers." *Martinez,* 563 F.3d at 1091(citation and quotation marks omitted).

In this regard, Plaintiff has failed to establish the commission of a constitutional violation within the two year period preceding the filing of this lawsuit; absent any underlying constitutional violation within the statutory period, Defendant Sheriff of Canadian County in his official capacity cannot be liable even if his policies and supervision of the county's officers were unconstitutional. *Trigalet v. City of Tulsa,* 239 F.3d 1150, 1155-56 (10th Cir. 2001).

## **RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT**

For the reasons set forth above, it is the recommended that Defendants' alternative motion for summary judgment [Doc. No. 35] be granted.

The parties are advised of their right to object to this Report and Recommendation by April 18, 2011, in accordance with 28 U.S.C. §636 and Fed. R. Civ. P. 72. The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this 29th day of March, 2011.

_____
BANA ROBERTS
UNITED STATES MAGISTRATE JUDGE